UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BRIAN K. WHITE,                                             :
                                                            :        <u>OPINION & ORDER</u>
                                    Plaintiff,              :        22 Civ. 2205 (VEC) (GWG)
                                                            :
          -against-                                         :
                                                            :
DISTOKID, et al.,                                           :
                                                            :
                                    Defendants.             :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

Plaintiff Brian White has brought suit against defendants DistroKid, LLC, Kid Distro

Holdings, LLC, d/b/a Distrokid, (collectively, "DistroKid") and Eunice Rivers for violations of

the Copyright Act and breach of contract.  <u>See</u> First-Amended Complaint, filed Dec. 12, 2023

(Docket # 69) ("Am. Compl.").  DistroKid has moved to dismiss the claims against it.[1]  For the

following reasons, the motion is granted in part and denied in part.

I. <u>BACKGROUND</u>

     A.  <u>Factual Background</u>

Plaintiff White is a professional musician who "writes music and beats; does live

performances; mixes, produces, sound engineers recorded tracks; and also writes and directs his

own music videos."  Am. Compl. ¶ 10.  Defendant Rivers is also a musician and "known in the

New Jersey area as an accomplished music and club promoter."  <u>Id.</u> ¶¶ 15, 17.  White and Rivers

met in 2017, <u>id.</u> ¶ 14, and Rivers "took an interest in Mr. White, in part, because of his musical

---

[1]  <u>See</u> Defendants Distrokid, LLC's and Kid Distro Holdings, LLC's Notice of Motion
and Motion to Dismiss, filed Jan. 24, 2024 (Docket # 76) ("Mot."); Memorandum of Law in
Support, filed Jan. 24, 2024 (Docket # 77) ("Mem."); Plaintiff Brian White's Opposition, filed
Feb. 28, 2024 (Docket # 84) ("Opp."); Reply Memorandum of Law, filed Mar. 27, 2024 (Docket
# 85) ("Reply"); Letter, filed May 24, 2024 (Docket # 88) ("Pl. Supp. Letter"); Letter, filed June
7, 2024 (Docket # 89) ("Def. Supp. Letter").

talents, including his ability to write beats . . .," id. ¶ 16.

White "primarily creates beats for his own music" but also "creates beats and licenses them to other artists." Id. ¶ 20.  In November 2020, White created a "series of beats for a number of songs to present for possible licensing to two artists in the New Jersey area." Id. ¶ 21. White worked "[a]lone and in his own recording studio" and registered a set of beats (hereinafter, "Original Beats"), "along with other songs," with the United States Copyright Office. Id. ¶¶ 22, 25 (providing Copyright Registration number of PAu004070068).  At some point, Rivers and White "discussed the possibility of Ms. Rivers licensing the Original Beats from Mr. White." Id. ¶ 27.

Sometime between December 2020 and January 2021, White and Rivers "entered into an oral agreement." Id. ¶ 28.  The agreement provided that Rivers "could use the Original Beats as music for her singing (recorded and live), so long as she continued to book live performances for Mr. White to perform at and so long as she provided Mr. White with 50% of the proceeds of the exploitation of the Original Beats or any music that included the Original Beats." Id. ¶ 29.  The agreement also provided that if "Rivers failed to continue to perform her payment and live-performance obligations, the license rights would automatically revert back to Mr. White and Ms. Rivers would no longer have the right to use the Original Beats." Id.  White alleges that he has "entered into similar licensing agreements with other artists." Id. ¶ 31.

At some point between December 2020 and April 2021, White emailed electronic copies of the Original Beats to Rivers. Id. ¶ 32.  After deciding on which beats she wanted to use, Rivers "without any contribution from Mr. White, wrote lyrics and melodies, or reused lyrics and melodies already written by Ms. Rivers years before, to perform with the Original Beats." Id. ¶ 33.  Rivers thereby created an album entitled "Here I Am" ("Album"), which is comprised of

several songs.  Id. ¶ 35.

After she created the Album, Rivers "would reach out to Mr. White to get permission and authorization from him to share the Album."  Id. ¶ 39.  This included two instances where Rivers sought "permission" to share the Album "with a radio station" and "to use and/or display the Album in a video."  Id. ¶¶ 40-41.  On an unspecified date after Rivers created the Album, White "posted the Album to DistroKid for Ms. Rivers."  Id. ¶ 47.

DistroKid is "a music distributor, i.e., a company that, for a fee, populates a musician's music to a variety of streaming services, online music stores, and other platforms," such as Spotify, iTunes, Amazon, TikTok, and YouTube Music (collectively, the "Digital Stores").  Id. ¶ 69; see id. ¶¶ 70, 73.  DistroKid "charges an annual fee in exchange for use of its distribution platform" and "offers users upcharges upon each upload of music to [the] Digital Stores."  Id. ¶ 71.  After a DistroKid user creates an account and uploads their work to DistroKid, DistroKid will "modify the copy to conform with each Digital Store's uploading requirements," upload the content onto the Digital Stores' platforms, and collect royalties from the Digital Stores, which it distributes to the user's DistroKid account.  Id. ¶ 73.  DistroKid retains the right to remove any content from the Digital Stores "for reasons including failure to pay its annual fee, its receipt of takedown notices submitted to Digital Stores, or any reason in its business judgment."  Id. ¶ 74.

After Rivers created the Album, Rivers and White performed in a show together, which included performance of music from the Album.  Id. ¶ 48.  However, after that show "Rivers did not continue to meet her obligations under the Agreement to schedule live performances for Mr. White."  Id. ¶ 49.  While Rivers "performed songs from the Album at numerous live events," she "did not ask Mr. White to perform at these live performances," "did not pay Mr. White his 50% of the proceeds from any of these live performances," and "did not pay Mr. White 50%" of the

proceeds generated by the Album.  Id. ¶¶ 50-54.  On September 9, 2021, Rivers registered the

Album with the United States Copyright Office.  Id. ¶ 57 (providing registration number of

PA0002326762).  In the registration, she "did not reference Mr. White's copyright registration of

the Original Beats."  Id.

On December 7, 2021, White "reiterated" to Rivers that she "no longer had his

authorization under the license Agreement to use his Original Beats" and indicated that she

"must cease any uses of his Original Beats, including any use in the Album."  Id. ¶¶ 58-60.  On

the same day, White removed the Album from DistroKid.  Id. ¶ 59.  Nonetheless, Rivers

continued to make copies, distribute, and perform the Album.  Id. ¶¶ 61-65.  Sometime between

December 7, 2021, and March 10, 2022, Rivers uploaded the Album to DistroKid herself.  Id. ¶¶

66, 75.  DistroKid then "changed the format of at least one copy" of the Album and "distributed

the Album to various Digital Stores."  Id. ¶¶ 78-79.  On March 10, 2022, White learned that

Rivers had re-uploaded the Album to Distrokid and sent an email to Rivers requesting that it be

taken down from DistroKid and the Digital Stores.  Id. ¶¶ 67-68.

### B. Procedural Background

On March 17, 2022, White filed the instant action.  See Complaint for Copyright

Infringement, filed Mar. 17, 2022 (Docket # 2).  Plaintiff filed the amended complaint on

December 12, 2023.  See Am. Compl.  On January 24, 2024, DistroKid filed the instant motion

to dismiss.  The parties consented to adjudication of the motion by the undersigned.

## II. LEGAL STANDARD

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) when the opposing

party's complaint "fail[s] to state a claim upon which relief can be granted."  While a court must

accept as true all of the factual allegations contained in a complaint, that principle does not apply

to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (punctuation and alterations omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678, and a court's first task is to disregard any conclusory statements in a complaint, id. at 679.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and punctuation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (internal citation and punctuation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n]' . . . 'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

III.  DISCUSSION

White brings two causes of action against DistroKid: one for direct copyright infringement and another for indirect copyright infringement.  See Am. Compl. ¶¶ 97-104. DistroKid argues that White fails to state a claim against it, see Mem. at 4-10, and in the event the Court finds otherwise, that it is immune from liability under section 512(c) of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, see Mem. at 10-12.  We address each of

these arguments separately.

    A.  <u>Direct Copyright Infringement</u>

    "To establish a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" <u>Abdin v. CBS Broad. Inc.</u>, 971 F.3d 57, 66 (2d Cir. 2020) (quoting <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991)); <u>accord</u> <u>Brunswick Recs. Corp. v. Lastrada Ent. Co.</u>, 2023 WL 3010967, at *3 (S.D.N.Y. Apr. 20, 2023).  "To satisfy the second element, a plaintiff must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's work." <u>Id.</u> (citation and punctuation omitted).  "The word 'copying' is shorthand for the infringing of any of the copyright owner's . . . exclusive rights . . . described in [17 U.S.C.] § 106." <u>Arista Recs., LLC v. Doe 3</u>, 604 F.3d 110, 117 (2d Cir. 2010) (citation and punctuation omitted).  The relevant rights listed in 17 U.S.C. § 106 are "the exclusive right[] . . . (1) to reproduce the copyrighted work in copies or phonorecords; . . . (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; . . . [and] (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

    Here, DistroKid does not dispute that White owns a valid copyright in the Original Beats and that by distributing the Album, Distrokid "copied" the Original Beats that were used in the Album.  Rather, DistroKid argues that White's Original Beats were a component of a "joint work," the Album, and thus, both White and Rivers have equal rights to distribute it.  <u>See</u> Mem. at 4-6.  DistroKid also argues that because White licensed his Original Beats to Rivers to create

the Album, Rivers and, by extension, DistroKid were permitted to distribute the Album and the Original Beats.  See Mem. at 6-8.

We address each of these arguments next.

1.  Joint Work

DistroKid argues that the Original Beats were a component of a "joint work," the Album, and therefore White and Rivers, as co-owners of this work, had equal rights to allow for the work's distribution.  See Mem. at 5-6.

The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole."  17 U.S.C. § 101; accord Brooks v. Dash, 852 F. App'x 40, 40-41 (2d Cir. 2021); Webber v. Dash, 2021 WL 3862704, at *8 (S.D.N.Y. Aug. 30, 2021).  The authors of a joint work are considered co-owners, 17 U.S.C. § 201(a), and are to "be treated generally as tenants in common, with each co[-]owner having an independent right to use or license the use of a work, subject to a duty of accounting to the other co[-]owners for any profits," Davis v. Blige, 505 F.3d 90, 98 (2d Cir. 2007) (citation and quotation marks omitted) (alteration in original); accord Champlin v. Music Sales Corp., 604 F. Supp. 3d 224, 232 (S.D.N.Y. 2022).

In the context of a co-authorship claim, the party asserting co-authorship "bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors."  Thomson v. Larson, 147 F.3d 195, 200 (2d Cir. 1998) (citing Childress v. Taylor, 945 F.2d 500, 507-08 (2d Cir. 1991)); accord Webber, 2021 WL 3862704, at *8.  As to the second element, the intent of the parties, a court must conduct a "nuanced inquiry into factual indicia of ownership and authorship, such as

how a collaborator regarded herself in relation to the work in terms of billing and credit, decisionmaking, and the right to enter into contracts."  Larson, 147 F.3d at 201.

DistroKid's primary argument is that "there is no dispute Plaintiff and Rivers intended for their respective parts to be symbiotic components of the final musical works embodied on the Album," Mem. at 5, and thus, "in the absence of an agreement otherwise made in advance, parties who make interdependent contributions to a work are co-authors," Def. Supp. Letter at 2 (quoting Malloy v. EMI Christian Music Grp., Inc., 2012 WL 13388992, at *3 (S.D.N.Y. May 16, 2012)).  We disagree with DistroKid's claim that the amended complaint lacks indicia that the parties did not intend to be co-authors.  First, White's allegations pertaining to the oral agreement reached by White and Rivers — under which Rivers was permitted to use White's contribution so long as she satisfied certain obligations, see Am. Compl. ¶ 29 — directly negates an inference of co-authorship.  Indeed, courts have found a lack of intent to be co-authors where there is an agreement restricting the use of a work or retaining certain rights in one of the authors.  See, e.g., Gilliam v. Am. Broad. Companies, Inc., 538 F.2d 14, 22 (2d Cir. 1976) (licensing agreement under which author retained certain rights to license the work "for use on television to parties other than" the defendant "suggest[ed] that the parties did not consider themselves joint authors of a single work"); see also Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1072 (7th Cir. 1994) (existence licensing agreement showed lack of joint authorship).  Second, as White points out, see Pl. Supp. Letter at 2, courts find "the way in which the parties bill or credit themselves to be significant," Larson, 147 F.3d at 203.  In the instant case, there is no indication that the Album was attributed in any way to White, which further negates an inference of an intent to be co-authors.  See id. ("[A] writer's attribution of the work to herself alone is 'persuasive proof . . . that she intended this particular piece to represent her own

individual authorship' and is 'prima facie proof that [the] work was not intended to be joint.'")

(alterations in original) (quoting Weissmann v. Freeman, 868 F.2d 1313, 1320 (2d Cir. 1989)).

Finally, there is no indication that White had any decisionmaking authority over the creation of

the Album, which further negates a finding of co-authorship.  See Larson, 147 F.3d at 202-03

("An important indicator of authorship is a contributor's decisionmaking authority over what

changes are made and what is included in a work.").

Obviously, the above indicia do not foreclose a later finding that the Album constitutes a

joint work based on other evidence that may be adduced at trial inasmuch as a finding that a

work is joint requires a "nuanced inquiry into factual indicia of ownership and authorship."

Larson, 147 F.3d at 201; Caffey v. Cook, 409 F. Supp. 2d 484, 499 (S.D.N.Y. 2006) ("[T]he

Second Circuit has declined to define explicitly what sorts of proof are necessary to show joint

intent, perhaps because the test of co-authorship intent will vary depending on the specific

factual circumstances.") (citation and internal quotation marks omitted).  Thus, we do not

definitively resolve the issue based on the allegations in the amended complaint.  See Exceller

Software Corp. v. Pearson Educ., Inc., 2010 WL 4486944, at *4 (S.D.N.Y. Nov. 9, 2010) ("The

question of whether the parties intended to be co-authors is not susceptible to resolution on a

motion to dismiss.").

The case law primarily relied on by DistroKid is distinguishable.  See Mem. at 5-6; Def.

Supp. Letter at 2.  For example, in Carroll v. Kahn, 2003 WL 22327299 (N.D.N.Y. Oct. 9,

2003), the issue of co-authorship was essentially not in dispute since the copyright registration

had the parties listed as co-authors.  See id. at *4 ("The registration lists Plaintiff and Benjamin

Kahn as co-authors.  As such, there is a rebuttable presumption that they are, in fact, co-

owners.") (citations omitted).  In Malloy, 2012 WL 13388992, the court addressed a situation

where the complaint itself alleged that the question of ownership was not discussed until after the creation of the work, and thus, there was no suggestion that the parties did not intend to be co-authors initially.  See id. at *3 ("[B]ecause Plaintiff has pleaded that the parties did not discuss ownership at the time they created the song, Plaintiff will be able to establish at most that he and Paulk were joint authors and are joint owners of the copyright.").  Here, the alleged oral agreement shows an intent to explicitly condition Rivers' use of White's contribution on Rivers' performance of the terms of the oral agreement.  See Am. Compl. ¶ 29.

Accordingly, DistroKid's argument that the Album is a "joint work" must be rejected at this stage.

### 2. Effect of White's Licensing of the Original Beats to Rivers

DistroKid argues that it was entitled to distribute the Album and the Original Beats because White had granted Rivers a license to use the Original Beats in her album.  See Mem. at 6-8.  White makes three arguments as to why such licensing rights did not exist.  See Opp. at 9-10.  First, White argues that Rivers never received a right to use his Original Beats since she never fulfilled the conditions upon which the license would be granted — namely, that Rivers had to "continue[] to book live performances for Mr. White" and pay White "50% of the proceeds of the exploitation of the Original Beats or any music that included the Original Beats." Am. Compl. ¶ 29; see Opp. at 9.  Second, White argues that even if the licensing rights vested at some point, there was a "reversion" of these rights after Rivers did not book performances for White or pay him 50% of the proceeds from the exploitation of the Original Beats as agreed.  See Opp. at 9.  Finally, White argues that even if the licensing rights vested and they did not revert, he revoked Rivers' licensing rights.  See id. at 10.

The agreement at issue between White and Rivers was oral and was "negotiated and agreed upon" in New Jersey.  Am. Compl. ¶¶ 29-30.  White alleges that the agreement had the following terms:

> Ms. Rivers could use the Original Beats as music for her singing (recorded and live), so long as she continued to book live performances for Mr. White to perform at and so long as she provided Mr. White with 50% of the proceeds of the exploitation of the Original Beats or any music that included the Original Beats. However, pursuant to the Agreement, if Ms. Rivers failed to continue to perform her payment and live-performance obligations, the license rights would automatically revert back to Mr. White and Ms. Rivers would no longer have the right to use the Original Beats.

Am. Compl. ¶ 29.  Both parties acknowledge the formation of this agreement, which White asserts is governed by New Jersey law.  See Opp. at 9 n.2.

DistroKid argues that while White may have a contract claim against Rivers for violation of their agreement, any claim does not sound in copyright.  In brief, DistroKid argues that where "a copyright owner [ ] grants a nonexclusive license to use his copyrighted material," that owner "waives" the right to sue for infringement and "may sue only for breach of contract."  Mem. at 6 (citation and internal quotation marks omitted).   DistroKid further argues that because there was consideration for White's license, the license was "irrevocable" and Rivers' obligations were enforceable only as "contractual obligations."  Id. at 7-8.

In Graham v. James, 144 F.3d 229 (2d Cir. 1998), the Second Circuit considered the issue of whether a licensee's failure to perform its obligations of paying royalties and including a notice giving credit to the licensor "voided" an implied license.  See id. at 236-37.  Graham stated that the question turned on whether the obligations were a "breach of a covenant" that inhered the license — which would relegate the licensor exclusively to a remedy in breach of contract — or whether the obligations were a "condition" of the license, which would mean that the material had "not been effectively licensed, and therefore, any use by the licensee is without

11

authority from the licensor and may therefore, constitute an infringement of copyright." Id. at 237.

Here, the amended complaint alleges that compliance with the terms of the oral agreement were a "condition" of the license because, as alleged in the amended complaint, "if Ms. Rivers failed to continue to perform her payment and live-performance obligations, the license rights would automatically revert back to Mr. White and Ms. Rivers would no longer have the right to use the Original Beats." Am. Compl. ¶ 29 (emphasis added). Thus, unlike Graham, where the parties had not spelled out what would happen if the licensee did not satisfy the covenants or conditions, the parties' agreement here is unmistakable: Rivers would no longer have any license to exploit the work if she failed to adhere to her obligations. Having alleged that Rivers did not satisfy her obligations, the amended complaint adequately alleges that Rivers no longer had any license in the work.

Additionally, even if Rivers' performance of her obligations could be characterized as a covenant, "[a] material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work thereafter." Graham, 144 F.3d at 237; accord PaySys Int'l, Inc. v. Atos Se, Worldline SA, Atos IT Servs. Ltd., 226 F. Supp. 3d 206, 215 (S.D.N.Y. 2016). Here, the amended complaint alleges that White revoked or rescinded Rivers' right to use the Original Beats because Rivers had failed to satisfy the obligations specified in the oral agreement. Am. Compl. ¶¶ 56, 58, 60. Plaintiff specifically alleges that "[o]n or around December 7, 2021, Mr. White reiterated to Ms. Rivers that she no longer had his authorization under the license Agreement to use his Original Beats." Am. Coml. ¶ 58. All this occurred before Rivers uploaded the Album to DistroKid. See id. ¶ 66.

DistroKid argues that the license granted by White to Rivers was not revocable at-will because it was supported by consideration.  See Mem. at 6-8; Reply at 1, 3-4.  Therefore, according to DistroKid, White's purported revocation did nothing to alter Rivers' rights to use the Original Beats.  The case cited by DistroKid, Latour v. Columbia Univ., 12 F. Supp. 3d 658 (S.D.N.Y. 2014), enunciates this principle by noting that "a nonexclusive license, 'may be irrevocable if supported by consideration because then the implied license is an implied contract.'"  Id. at 662 (quoting Unclaimed Prop. Recovery Serv. v. Kaplan, 2012 WL 4195241, at *4 (E.D.N.Y. Sept. 19, 2012)).  Here, however, it is alleged that one of the terms of the oral agreement was that "if Ms. Rivers failed to continue to perform her payment and live-performance obligations, the license rights would automatically revert back to Mr. White and Ms. Rivers would no longer have the right to use the Original Beats."  Am. Compl. ¶ 29.  White alleges that Rivers failed to satisfy those two obligations, see id. ¶¶ 51, 54, 55, and that he then informed her that "she no longer had his authorization under the license Agreement to use his Original Beats," id. ¶ 58.  This was all allegedly done before Rivers uploaded the Album to DistroKid.  Thus, regardless of whether consideration made the agreement irrevocable at-will or whether White "revoked" the agreement, Rivers did not have the right to use the Original Beats at the time she uploaded the Album to DistroKid under the plain terms of the agreement.  See Tasini v. N.Y. Times Co., 206 F.3d 161, 170 (2d Cir. 2000) ("[T]he fact that a party has licensed certain rights to its copyright to another party does not prohibit the licensor from bringing an infringement action where it believes the license is exceeded or the agreement breached."); PaySys Int'l, Inc. v. Atos Se, Worldline SA, Atos IT Servs. Ltd., 226 F. Supp. 3d 206, 215 (S.D.N.Y. 2016) ("[T]he Second Circuit has recognized that a licensor may recover against a licensee for copyright infringement where (1) the licensee's alleged infringement is outside the

scope of the license; (2) the licensee failed to satisfy a condition precedent to the license, such that the license is invalid; or (3) the licensor rescinded the license after the licensee materially breached one of its covenants.") (citing <u>Graham</u>, 144 F.3d at 235-38).[2]

*    *    *

Finally, DistroKid argues that even if it was not entitled to distribute the Original Beats by way of the Album, it nonetheless cannot be liable for direct copyright infringement since there was no "volitional conduct" on its part. <u>See</u> Reply at 1-2. We decline to consider this argument, however, because it was made for the first time in DistroKid's reply brief and thus plaintiff never had an opportunity to respond to it. <u>See</u> <u>Playboy Enterprises, Inc. v. Dumas</u>, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."), <u>aff'd</u>, 159 F.3d 1347 (2d Cir. 1998). This ruling is without prejudice to DistroKid raising this argument in an appropriate motion.

Accordingly, DistroKid's motion to dismiss White's direct copyright infringement claim is denied.

### B.  Indirect Copyright Infringement

White's second cause of action against DistroKid is for "indirect copyright infringement." <u>See</u> Am. Compl. ¶¶ 100-104. Specifically, White alleges DistroKid is liable for both vicarious and contributory copyright infringement. <u>See</u> Opp. at 12-13; <u>see</u> <u>also</u> <u>Lopez v. Bonanza.com, Inc.</u>, 2019 WL 5199431, at *23-25 (S.D.N.Y. Sept. 30, 2019) (considering

---

[2]  DistroKid repeatedly refers to the fact that at one point White himself uploaded the Album to DistroKid, <u>see</u> <u>e.g.</u>, Mem. at 10, Def. Supp. Letter at 2, which the amended complaint alleges he later took down, <u>see</u> Am. Compl. ¶ 59. DistroKid's argument is a red herring because the amended complaint alleges that Rivers later re-uploaded the Album, and it is this latter upload that is the subject of the infringement claims. <u>See</u> <u>id.</u> ¶ 66.

vicarious and contributory copyright infringement in the context of an "indirect" copyright infringement claim). We address each separately.

    1.  <u>Vicarious Copyright Infringement</u>

A person commits vicarious copyright infringement when the person "profit[s] from direct infringement while declining to exercise a right to stop or limit it." <u>Spinelli v. Nat'l Football League</u>, 903 F.3d 185, 197 (2d Cir. 2018) (quoting <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 930 (2005)); <u>accord</u> <u>Plaid Takeover, LLC v. Owens</u>, 2023 WL 6541300, at *6 (S.D.N.Y. Oct. 6, 2023). Thus, to state a claim for vicarious copyright infringement, a plaintiff must "allege that a defendant [1] has declined to exercise the right and ability to supervise or control the infringing activity and [2] enjoys a direct financial benefit from the infringing activity." <u>Rams v. Def Jam Recordings, Inc.</u>, 202 F. Supp. 3d 376, 385 (S.D.N.Y. 2016). Importantly, "[w]hile knowledge — either constructive or actual — is a required element of contributory copyright infringement, it is not required to state a claim for vicarious copyright infringement." <u>Premier Fabrics, Inc. v. Woodland Trading Inc.</u>, 42 F. Supp. 3d 549, 555 (S.D.N.Y. 2014) (internal citations omitted).

As for the first prong, the Second Circuit has stated, "the policies of the copyright law would be best effectuated if [defendant] were held liable, even in the absence of actual knowledge that the copyright monopoly was being impaired, for its failure to police the conduct of the primary infringer." <u>Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.</u>, 443 F.2d 1159, 1162 (2d Cir. 1971). In other words, "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." <u>Arista Recs. LLC v. Usenet.com, Inc.</u>, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (citation and quotation marks omitted); <u>accord</u> <u>Viacom Int'l, Inc. v. YouTube, Inc.</u>, 676 F.3d 19, 37 (2d Cir.

2012).  Under this formulation of the test, White has provided sufficient factual allegations establishing DistroKid had the "right and ability to supervise or control the infringing activity." In particular, White alleges that DistroKid had the ability to remove content from the Digital Stores "for reasons including failure to pay its annual fee, its receipt of takedown notices submitted to Digital Stores, or any reason in its business judgment."  Am. Compl. ¶ 74; see id. ¶ 82 ("DistroKid could cease the commercial exploitation of musical works it has distributed."). Such an allegation satisfies the first prong of the test.  See BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 357 (S.D.N.Y. 2014) (finding allegations that defendants "retain the right of full control over the content of the websites" sufficient to establish the control prong); Capitol Recs., LLC v. Escape Media Grp., Inc., 2015 WL 1402049, at *42 (S.D.N.Y. Mar. 25, 2015) (finding ability to "deny access" and "supervise" users sufficient); see also In re Frontier Commc'ns Corp., 2024 WL 1299391, at *10 (Bankr. S.D.N.Y. Mar. 27, 2024) (collecting cases finding internet service providers liable for vicarious copyright infringement based on the "ability to terminate or block . . . subscribers' accounts").[3]

As to the second prong, direct financial benefit, a plaintiff must, inter alia, allege "a 'causal relationship between the infringing activity and any financial benefit [the] defendant reaps . . . .'" Rams, 202 F. Supp. 3d at 385 (quoting Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004)).  Here, White argues that the "user access fees" Rivers paid to DistroKid provided DistroKid with the requisite financial benefit.  Opp. at 12.  Specifically, the amended

---

[3]  We note that the Second Circuit has held that the DCMA's reference to the "right and ability to control" infringing activity, see 17 U.S.C. § 512(c)(1)(B), is not coextensive with the common law test for vicarious liability and that to satisfy the DCMA's requirement, "something more" must be shown than the mere ability to remove or block access to materials on a service provider's website.  See Viacom Int'l, Inc., 676 F.3d 19, 36-38 (2d Cir. 2012).  Thus, the above ruling does not foreclose DistroKid from asserting a defense under the DCMA.

complaint alleges that DistroKid "charges an annual fee in exchange for use of its distribution platform." Am. Compl. ¶ 71.[4]   The extent of White's analysis on this point is conclusory, however, stating merely that DistroKid "certainly profits from [users'] infringing activities because it accepts payment" in the form of the user access fees.  Opp. at 12.

We are thus faced with the argument that the mere payment of a monthly access fee is sufficient by itself to meet the causation requirement for vicarious liability, and thus to hold DistroKid vicariously liable for any copyright violations committed by Rivers.  The problem here is that White has failed to show that the infringing activity has a direct causal relationship to DistroKid's receipt of those monthly access fees.

The Fourth Circuit recently addressed the causation requirement for vicarious liability under the Copyright Act in Sony Music Ent. v. Cox Commc'ns, Inc., 93 F.4th 222 (4th Cir. 2024), in the context of a suit against an internet service provider ("ISP") brought by record companies and music publishers.  Subscribers paid the defendant ISP a "flat monthly fee" which the ISP received regardless of whether the subscriber used the ISP for "lawful or unlawful purposes." Id. at 230.  The Fourth Circuit recognized that a defendant may reap a financial interest in a third party's infringement even "absent a strict correlation between each act of infringement and an added penny of profits."  Id. at 231.  It cited as an example a case that considered the vicarious liability of the operator of a "swap meet," which did not charge commissions on individual sales but only collected various "admission fees, concession stand sales and parking fees."  Id. (quoting Fonovisa, Inc. v. Cherry Auction, Inc., 76 F.3d 259, 263 (9th Cir. 1996)).  The Fourth Circuit noted that while the case found the swap meet operator

---

[4] The amended complaint also alleges that Distrokid "offers users upcharges upon each upload of music to Digital Stores," but there is no allegation that any additional fees were paid by Rivers.  Am. Comp. ¶ 71.

liable, the basis for the ruling was that the sale of pirated recordings at the swap meet was a

"'draw' for customers."  Id. (quoting Fonovisa, Inc., 76 F.3d at 263).  Specifically, the prospect

of infringing sales at the swap meet "enhanced the attractiveness of the venue to potential

customers," which thus gave the swap meet operator "a financial interest in the infringement

sufficient to state a claim for vicarious liability."  Id. (alterations omitted).

> The Fourt Circuit analyzed the case before it as follows:

> Applying these principles to copyright infringement in cyberspace, courts and
> Congress agree that "'receiving a one-time set-up fee and flat periodic payments
> for service'" from infringing and noninfringing users alike ordinarily "'would not
> constitute receiving a financial benefit directly attributable to the infringing
> activity.'"  Ellison v. Robertson, 357 F.3d 1072, 1079 (9th Cir. 2004) (quoting S.
> Rep. 105-190, at 44 (1998)).  But "'where the value of the service lies in
> providing access to infringing material,'" those flat fees may constitute a direct
> financial benefit.  Id. (quoting S. Rep. 105-190, at 45).

> For example, the file-sharing service Napster had a direct financial interest in its
> users' exploitation of copyrighted music.  An increasing volume of pirated music
> available for download drew more users to register with Napster, and its "future
> revenue [was] directly dependent upon increases in userbase."  [A&M Recs., Inc.
> v.] Napster, 239 F.3d [1004, 1023 (9th Cir. 2001)] (internal quotation marks
> omitted).

> By contrast, America Online (AOL) was not vicariously liable for copyright
> infringement occurring over an online forum to which it provided its subscribers
> access.  Although access to online forums encouraged overall subscription to
> AOL's services, there was no direct financial benefit from infringement where no
> evidence indicated "that AOL customers either subscribed because of the
> available infringing material" or "canceled subscriptions" when the material was
> no longer available.  Ellison, 357 F.3d at 1079.  Without "evidence that AOL
> attracted or retained subscriptions because of the infringement or lost
> subscriptions because of [its] eventual obstruction of the infringement," "no jury
> could reasonably conclude that AOL received a direct financial benefit from
> providing access to the infringing material."  Id.

93 F.4th at 231.  The Fourth Circuit therefore found that the defendant ISP was not vicariously

liable for the infringing acts of its customers.  See id. at 232 ("The continued payment of

monthly fees for internet service, even by repeat infringers, was not a financial benefit flowing

directly <u>from the copyright infringement itself</u>.") (emphasis in original).  As the Fourth Circuit

put it: "While [the ISP] profited from the sale of internet service, Sony has not shown that [the

ISP], in any sense, had a financial interest in its subscribers committing infringement."  <u>Id.</u> at

233.

      The same result is dictated here.  White's amended complaint provides no facts showing

that the users of DistroKid are "drawn" to its platform in order to engage in or profit from

copyright infringement.  <u>See</u> <u>Rams</u>, 202 F. Supp. 3d at 385; <u>cf.</u> <u>Escape Media Group, Inc.</u>, 2015

WL 1402049, at *43 (infringing content was a "substantial draw" for customers of defendant's

streaming service "as demonstrated by the fact that approximately 84.5% of the website's

streams are of works belonging to major labels with whom Escape has no license").  We thus

cannot infer "a causal relationship between the infringing activity and any financial benefit [the]

defendant reaps . . . .'"  <u>Rams</u>, 202 F. Supp. 3d at 385 (citation and internal quotation marks

omitted).  Additionally, the monthly payments do not increase or decrease based on whether the

user uploads infringing or non-infringing products.  As a result, it cannot be said that the monthly

payments are causally related to infringing activity.  <u>See</u>, <u>e.g.</u>, <u>Ellison</u>, 357 F.3d at 1079

("Congress cautions courts that 'receiving a one-time set-up fee and flat periodic payments for

service . . . [ordinarily] would not constitute receiving a financial benefit directly attributable to

the infringing activity.'") (quoting S. Rep. 105-190, at 44 (1998) (internal quotation marks

omitted)).

      Certainly, there is no requirement that plaintiff show that the "financial benefit" to

DistroKid "be tied directly to sales of the infringing goods."  <u>Arista Records LLC v. Lime Grp.</u>

<u>LLC</u>, 784 F. Supp. 2d 398, 435 (S.D.N.Y. 2011).  But in the absence of such a showing, there

must be allegations "showing that users are attracted to a defendant's product because it enables

infringement." Id. (finding vicarious liability where users of LimeWire's file sharing program were "drawn to LimeWire because the program permits infringement").  Here, there are no allegations that users are drawn to and subscribe to DistroKid because it provides them with the ability to commit copyright infringement.

Accordingly, DistroKid's motion to dismiss the vicarious liability claim is granted.

### 2. Contributory Copyright Infringement

To state a claim for contributory copyright infringement, a plaintiff must allege that a party with "knowledge of the infringing activity[ ] induce[d], cause[d], or materially contribut[ed] to the infringing conduct of another." Arista Records, LLC, 604 F.3d at 117 (citation, quotation marks, and emphasis omitted); accord Gench v. HostGator.com LLC, 2015 WL 569154, at *9 (S.D.N.Y. Feb. 11, 2015), adopted by 2015 WL 1054968 (S.D.N.Y. Mar. 10, 2015).  To constitute a "material contribution," it must be alleged that defendant "(1) had actual or constructive knowledge of the infringing activity, and (2) encouraged or assisted others' infringement, or provided machinery or goods that facilitated infringement." Arista Recs. LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011); accord Lane Coder Photography, LLC v. Hearst Corp., 2023 WL 5836216, at *4 (S.D.N.Y. Sept. 8, 2023).  As for the knowledge prong, "[t]he knowledge standard is an objective one; contributory infringement liability is imposed on persons who know or have reason to know of the direct infringement." Arista, 604 F.3d at 118 (citation and internal quotation marks omitted).

Thus, "participation sufficient to establish a claim of contributory infringement may not consist of merely providing the means to accomplish an infringing activity." Hartmann v. Amazon.com, Inc., 2021 WL 3683510, at *6 (S.D.N.Y. Aug. 19, 2021) (citation and quotation marks omitted); accord Roberts v. BroadwayHD LLC, 2022 WL 976872, at *11 (S.D.N.Y. Mar.

31, 2022).  Instead, "the plaintiff must allege that the defendant 'substantially' participated in the infringing act and 'acted in concert with the direct infringer.'"  Bus. Casual Holdings, LLC v. YouTube, LLC, 2022 WL 837596, at *5 (S.D.N.Y. Mar. 21, 2022) (quoting Marvullo v. Gruner & Jahr, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000)); see Sadowski v. Ng, 2022 WL 799636, at *7 (S.D.N.Y. Mar. 15, 2022) ("While vicarious infringement is based on the defendant's relationship to the direct infringer, the theory of contributory infringement depends on the defendant's relationship to the direct infringement.") (citation and internal quotation marks omitted).

Here, the amended complaint fails to allege DistroKid had any actual or constructive knowledge that Rivers had uploaded infringing content and does not provide factual matter to suggest DistroKid and Rivers acted "in concert."  The only allegation to touch on the issue of knowledge alleges that DistroKid was merely aware of royalty payments received for the content — not that the content infringed on White's copyright.  See Am. Compl. ¶ 80 ("On information and belief, DistroKid is aware of precisely how these streaming services and royalty platforms were commercially exploiting Mr. White's Original Beats because DistroKid deploys tracking technology and/or receives reports from those services pursuant to agreements and established relationships.").  However, this does not amount to DistroKid having "actual or constructive knowledge of the infringing activity."  Arista Recs. LLC, 784 F. Supp. 2d at 432.  Therefore, at best, White merely alleges "that the defendant provided the third party with the opportunity to engage in wrongful conduct," which "is insufficient to survive a motion to dismiss."  Bus. Casual Holdings, LLC, 2022 WL 837596, at *5 (citation and quotation marks omitted).

White's only response to the issue of knowledge is that "DistroKid merely needs 'knowledge of the infringing activity,' not additional knowledge that the activity is infringing."

Opp. at 13 (emphasis in original).  However, the only case cited for this proposition, Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971), does not support White's position.  Gershwin Pub. Corp. found that the defendant could be "held liable as a 'contributory' infringer if it were shown to have had knowledge, or reason to know, of the infringing nature of the records."  443 F.2d at 1162.  The case never states that it is enough to know merely that some act took place that was later discovered to be an act of infringement. Ample case law stands for the proposition that actual or constructive knowledge of the infringing nature of the content must be alleged.  See Bus. Casual Holdings, LLC v. YouTube, LLC, 2023 WL 6842449, at *2 (2d Cir. Oct. 17, 2023) (affirming district court dismissal of contributory infringement claims where there was "not a single allegation in the amended complaint that [defendant] had any knowledge of [the direct infringer]'s use of the three allegedly infringing videos"); Klauber Bros., Inc. v. QVC, Inc., 2020 WL 7029088, at *9 (S.D.N.Y. Nov. 30, 2020) ("Plaintiff has not established that any Defendant had knowledge of Plaintiff's designs, much less knowledge of any infringing activity by a third party."); Gym Door Repairs, Inc. v. Young Equip. Sales, Inc., 206 F. Supp. 3d 869, 900 (S.D.N.Y. 2016) (dismissing contributory infringement claim where plaintiff failed to allege defendant "had knowledge that the [direct infringers] were infringing the plaintiffs' copyrights and refused to take action"); see also Wolk v. Kodak Imaging Network, Inc., 840 F. Supp. 2d 724, 751-52 (S.D.N.Y. 2012) (dismissing contributory infringement claim on summary judgment after plaintiff had "not demonstrated [defendant] . . . acted with knowledge that it was passing along infringing images"), aff'd, 69 F. App'x 51 (2d Cir. 2014).  Accordingly, DistroKid's motion to dismiss as to White's contributory infringement claim is granted.

C.  DMCA Immunity

DistroKid argues that the amended complaint should be dismissed because the DMCA

shields it from liability.  See Mem. at 10-12.  Section 512(c) immunizes service providers from

copyright infringement liability "by reason of the storage at the direction of a user of material

that resides on a system or network controlled or operated by or for the service provider," so long

as the service provider

> (A)(i) does not have actual knowledge that the material or an activity using the
> material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts or
> circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove,
> or disable access to, the material;
>
> (B) does not receive a financial benefit directly attributable to the infringing
> activity, in a case in which the service provider has the right and ability to control
> such activity; and
>
> (C) upon notification of claimed infringement as described in paragraph (3),
> responds expeditiously to remove, or disable access to, the material that is
> claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1); accord Steinmetz v. Shutterstock, Inc., 629 F. Supp. 3d 74, 80-81

(S.D.N.Y. 2022).

The DCMA, however, is an "affirmative defense" and thus can only act as a basis for

dismissal at this stage "if the defense appears on the face of the complaint."  Myeress v.

BuzzFeed Inc., 2019 WL 1004184, at *3 (S.D.N.Y. Mar. 1, 2019) (quoting Daiei Trading Co. v.

Williams Rice Milling Co., 30 F. App'x 13, 14 (2d Cir. 2002)) (emphasis omitted).  A plaintiff is

not required to plead facts showing that the DCMA does not apply.  See generally Constantini v.

Hartford Life & Accident Ins. Co., 2022 WL 1910137, at *1 (S.D.N.Y. June 3, 2022) ("[A]

plaintiff is not required to plead facts negating all possible affirmative defenses.") (citing Whiteside v. Hover-Davis, Inc., 995 F.3d 315, 321 (2d Cir. 2021)).

Here, the elements of the defense are not made out in the amended complaint.  Most obviously, there are no allegations related to DistroKid's knowledge of the infringing nature of the content or whether it had expeditiously removed the content after it learned it infringed on White's copyright.  See 17 U.S.C. § 512(c)(1)(A)(i)-(iii).  Contrary to the implication of DistroKid's argument, see Mem. at 11 (noting that plaintiff failed to allege facts negating the DMCA defense), the amended complaint cannot be dismissed because White failed to affirmatively allege such facts.  Accordingly, DistroKid's argument as to the DMCA does not provide a basis for dismissal on a motion to dismiss.

Conclusion

For the foregoing reasons, DistroKid's motion to dismiss (Docket # 76) is granted as to White's indirect copyright infringement claims and denied as to White's direct copyright infringement claim.

SO ORDERED.

Dated: June 24, 2024
     New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge