UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
BRIAN K. WHITE,

                                :       <u>OPINION AND ORDER</u>

                Plaintiff,             22 Civ. 2205 (VEC) (GWG)

                                :

    -against-

                                  :

DISTROKID, LLC, et al.,

                                  :

              Defendants.
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

       Plaintiff Brian White has brought suit against defendants DistroKid, LLC, Kid Distro

Holdings, LLC, d/b/a Distrokid (collectively, "DistroKid"), and Eunice Rivers for violations of

the Copyright Act and for breach of contract. <u>See</u> First-Amended Complaint, filed December 12,

2023 (Docket # 69) ("Am. Compl."). DistroKid has moved for judgment on the pleadings

pursuant to Fed. R. Civ. P. 12(c).[1] For the following reasons, the motion is granted.

I.  <u>FACTS</u>

      A.  <u>Allegations of the Complaint</u>

       For purposes of this motion to dismiss, we assume the facts as stated in the amended

complaint to be true.

---

[1] <u>See</u> Defendants DistroKid, LLC's and Kid Distro Holdings, LLC's Notice of Motion
and Motion for Judgment on the Pleadings, filed August 16, 2024 (Docket # 98); Memorandum
of Law in Support of Defendants DistroKid, LLC's and Kid Distro Holdings, LLC's Motion for
Judgment on the Pleadings Pursuant to FRCP 12(c), filed August 16, 2024 (Docket # 98-1)
("Mem."); Declaration of Jerry Chiang in Support of Defendants DistroKid, LLC's and Kid
Distro Holdings, LLC's Motion for Judgment on the Pleadings Pursuant to FRCP 12(c), filed
August 16, 2024 (Docket # 98-2) ("Chiang Decl."); Plaintiff Brian White's Opposition to
Defendants DistroKid's and Kid Distro's Motion for Judgment on the Pleadings (Dkt. 98), filed
September 27, 2024 (Docket # 104) ("Opp."); Reply Memorandum of Law in Support of
Defendants DistroKid, LLC's and Kid Distro Holdings, LLC's Motion for Judgment on the
Pleadings Pursuant to FRCP 12(c), filed October 21, 2024 (Docket # 105) ("Reply").

White is "a professional musician [who] writes music and beats; does live performances; mixes, produces, sound engineers recorded tracks; and also writes and directs his own music videos." Am. Compl. ¶ 10. While White "primarily creates beats for his own music, he also creates beats and licenses them to other artists." Id. ¶ 20. Defendant Rivers is "known in the New Jersey area as an accomplished music and club promoter," and is a musician in her own right. Id. ¶¶ 15, 17.

DistroKid is "a music distributor, i.e., a company that, for a fee, populates a musician's music to a variety of streaming services, online music stores, and other platforms," such as Spotify, iTunes, Amazon, TikTok, and YouTube Music (collectively, the "Digital Stores"). Id. ¶ 69; see id. ¶¶ 70, 73. DistroKid "charges an annual fee in exchange for use of its distribution platform" and "offers users upcharges upon each upload of music to [the] Digital Stores." Id. ¶ 71. As described by White, an artist can upload music to the Digital Stores via DistroKid in the following way:

> a. An artist creates an account and pays an annual fee; b. An artist uploads a copy of his song or album to DistroKid's website and chooses which Digital Stores it wants DistroKid to populate with his music; c. DistroKid, depending upon the requirements of the Digital Store, will modify the copy to conform with each Digital Store's uploading requirements; d. DistroKid will upload the modified copy to the selected Digital Stores; and e. DistroKid tracks and collects royalties from the Digital Stores and distributes them into the artist's DistroKid account.

Id. ¶ 73. DistroKid retains the right to remove any artist's content from the Digital Stores "for reasons including failure to pay its annual fee, its receipt of takedown notices submitted to Digital Stores, or any reason in its business judgment." Id. ¶ 74.

White and Rivers met in 2017 and began a professional relationship. Id. ¶¶ 14-16. In November 2020, White created a "series of beats for a number of songs to present for possible licensing to two artists in the New Jersey area." Id. ¶ 21. White worked "[a]lone and in his own

recording studio" and registered a set of beats (hereinafter, "Original Beats"), "along with other songs," with the United States Copyright Office.  Id. ¶¶ 22, 25.

Sometime between December 2020 and January 2021, White and Rivers entered into an oral agreement to license the Original Beats.  Id. ¶¶ 27-29.  The agreement provided that Rivers "could use the Original Beats as music for her singing (recorded and live), so long as she continued to book live performances for Mr. White to perform at and so long as she provided Mr. White with 50% of the proceeds of the exploitation of the Original Beats or any music that included the Original Beats."  Id. ¶ 29.  The agreement also provided that if "Rivers failed to continue to perform her payment and live-performance obligations, the license rights would automatically revert back to Mr. White and Ms. Rivers would no longer have the right to use the Original Beats."  Id.  White alleges that he has "entered into similar licensing agreements with other artists."  Id. ¶ 31.

At some point between December 2020 and April 2021, White sent electronic copies of the Original Beats to Rivers.  Id. ¶ 32.  After deciding on which beats she wanted to use, Rivers, "without any contribution from Mr. White, wrote lyrics and melodies, or reused lyrics and melodies already written by Ms. Rivers years before, to perform with the Original Beats."  Id. ¶ 33.  Rivers thereby created an album entitled "Here I Am" ("Album").  Id. ¶ 35.

White alleges that "[p]rior to sharing the recording of the Album, Ms. Rivers would reach out to Mr. White to get permission and authorization from him to share the Album."  Id. ¶ 39.  Thus, Rivers sought "permission to share the Album with a radio station" and "to use and/or display the Album in a video."  Id. ¶¶ 40-41.  On an unspecified date after Rivers created the Album, White "posted the Album to DistroKid for Ms. Rivers."  Id. ¶ 47.

After Rivers created the Album, she "obtained a single show for Mr. White," at which

"they performed music from the Album together." Id. ¶ 48. After that single show, however, "Rivers did not continue to meet her obligations under the Agreement to schedule live performances for Mr. White." Id. ¶ 49. While Rivers "performed songs from the Album at numerous live events," she "did not ask Mr. White to perform at these live performances," "did not pay Mr. White his 50% of the proceeds from any of these live performances," and "did not pay Mr. White 50%" of the proceeds generated by the Album. Id. ¶¶ 50-54.

On September 9, 2021, Rivers registered the Album with the United States Copyright Office. Id. ¶ 57. In the registration, she "did not reference Mr. White's copyright registration of the Original Beats." Id.

On December 7, 2021, White "reiterated" to Rivers that she "no longer had his authorization under the license Agreement to use his Original Beats" and indicated that she "must cease any uses of his Original Beats, including any use in the Album." Id. ¶¶ 58, 60. On the same day, White removed the Album from DistroKid. Id. ¶ 59. Nonetheless, Rivers continued to use White's Original Beats and make copies of, distribute, and perform the Album. Id. ¶¶ 61-65.

Sometime between December 7, 2021, and March 10, 2022, Rivers uploaded the Album to DistroKid using her own DistroKid account. Id. ¶ 66.

Once the Album had been uploaded to DistroKid, DistroKid "made and stored a complete copy of the Album on its servers," "made additional unauthorized copies from the copy posted by Ms. Rivers," "also without authorization . . . changed the format of at least one copy," and "[w]ithout authorization, . . . then distributed the Album to various Digital Stores [which had been] chosen by DistroKid for the express purpose of publicly and commercially distribut[ing] and performing copyrighted music." Id. ¶¶ 76-79.

4

B.  Distribution Agreement

"A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted).  Documents are integral to the complaint if the "plaintiff has actual notice" of the information contained in the documents and has "relied upon these documents in framing the complaint."  Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)).

DistroKid attached to its motion papers copies of two documents.  First, defendant attaches a "Distribution Agreement," which Jerry Chiang, General Counsel for Defendant DistroKid, declares plaintiff and DistroKid had "entered into."  Chiang Decl. ¶¶ 2-3; see DistroKid Distribution Agreement, dated June 8, 2021, annexed as Ex. A to Chiang Decl. ("Distribution Agreement").  Second, defendant attaches the "Terms of Service," which Chiang alleges "[a]ll users of the DistroKid platform who enter into a distribution relationship . . . agree to be bound by."  Chiang Decl. ¶ 4; see DistroKid Website Terms of Service, dated December 29, 2021, annexed as Ex. B to Chiang Decl. ("Terms of Service").

The amended complaint incorporates by reference the Distribution Agreement and Terms of Service.  First, the amended complaint explicitly references DistroKid's Terms of Service. Am. Compl. ¶ 8(b) ("Rivers has conducted business in the state of New York by contracting with DistroKid here.  See 'DistroKid Terms of Service,' DistroKid (updated May 1, 2023).").[2]

_____

[2]  The underlined text — "DistroKid Terms of Service" — contains a hyperlink to a document entitled "DistroKid Terms of Service," which appears to be a later version of the Terms of Service submitted by defendant.

Additionally, the amended complaint references contractual clauses contained in the Distribution Agreement. <u>Compare</u> Am. Compl. ¶ 82 (DistroKid "retains the contractual authority with the Digital Stores to get materials removed."), <u>and</u> <u>id.</u> ¶ 83 ("DistroKid could have refused to post the materials via its contractual authority."), <u>with</u> Distribution Agreement ¶ 2(e) ("We may also decline to distribute (or may remove from Digital Stores) one or more Recordings from any or all Digital Stores.").

Lastly, White does not oppose DistroKid's argument, <u>see</u> Mem. at 2-3, that the Distribution Agreement is incorporated by reference and even cites to it in support of his own arguments. <u>See</u> Opp. at 7-8.

Accordingly, we deem the Distribution Agreement and the Terms of Service to be incorporated by reference into the amended complaint.

## II. <u>LEGAL STANDARD</u>

### A. <u>Standard for a Motion for Judgment on the Pleadings</u>

The standard for analyzing a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) is identical to the standard for a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6). <u>See</u> <u>Cleveland v. Caplaw Enters.</u>, 448 F.3d 518, 521 (2d Cir. 2006).

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) when the opposing party's complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). While a court must accept as true all of the factual allegations contained in a complaint, that principle does not apply to legal conclusions. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009); <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.")

(punctuation, citation, and alterations omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678 (citation omitted), and a court's first task is to disregard any conclusory statements in a complaint, id. at 679.

Next, a court must determine if the complaint contains "sufficient factual matter" which, when accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and punctuation omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (internal citation and punctuation omitted).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n]'—'that the pleader is entitled to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

B.  The Volitional Conduct Requirement

The amended complaint makes claims against DistroKid for two causes of action: direct copyright infringement and indirect copyright infringement.  See Am. Compl. ¶¶ 97-104.  In a previous Opinion and Order, the Court dismissed White's indirect copyright infringement claims.  See White v. DistroKid, 738 F. Supp. 3d 387 (S.D.N.Y. June 24, 2024).  In the instant motion, DistroKid moves for judgment on the pleadings on the direct copyright infringement claim on the ground that it did not engage in "volitional conduct."  See Mem. at 4-8.

"To establish a claim of copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are

original.'" Abdin v. CBS Broad. Inc., 971 F.3d 57, 66 (2d Cir. 2020) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)); accord Brunswick Recs. Corp. v. Lastrada Ent. Co., 2023 WL 3010967, at *3 (S.D.N.Y. Apr. 20, 2023). "The word 'copying' is shorthand for the infringing of any of the copyright owner's . . . exclusive rights . . . described in [17 U.S.C.] § 106." Arista Recs., LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citation and punctuation omitted). The relevant rights listed in 17 U.S.C. § 106 are "the exclusive right[] . . . (1) to reproduce the copyrighted work in copies or phonorecords; . . . (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; . . . [and] (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

To be liable for direct infringement, a defendant must have engaged in what case law calls "volitional conduct" that "causes the copying or distribution." ABKCO Music, Inc. v. Sagan, 50 F.4th 309, 321 (2d Cir. 2022) (citation omitted and punctuation altered). The volitional conduct requirement is an "element of direct liability." Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008) ("Cartoon Network"). Thus, to survive a motion to dismiss, "a plaintiff must plead that the defendant engaged in some 'volitional conduct' that caused the copyright infringement." Bus. Casual Holdings, LLC v. YouTube, LLC, 2022 WL 837596, at *3 (S.D.N.Y. Mar. 21, 2022) (citations omitted); see Lopez v. Bonanza.com, Inc., 2019 WL 5199431, at *22 (S.D.N.Y. Sept. 30, 2019) ("Here, there is no adequate a[]llegation of volitional conduct, thereby preventing Plaintiff from establishing direct copyright infringement."). Engaging in volitional conduct requires some active steps, as opposed to mere passive action. See Bus. Casual Holdings, LLC, 2022 WL 837596, at *3 (requiring a plaintiff to allege, at the motion to dismiss stage, that the platform played "some 'deliberate role'" in the

alleged infringement" and distinguishing passive from active actions) (citations omitted); accord VHT, Inc. v. Zillow Grp., Inc., 918 F.3d 723, 732 (9th Cir. 2019) ("[D]irect copyright liability for website owners arises when they are actively involved in the infringement. 'The distinction between active and passive participation' in the alleged infringement is 'central' to the legal analysis.") (internal citations, alteration marks, and some internal quotation marks omitted) (emphasis in original).

Second Circuit case law makes clear that where a machine or system automatically undertakes actions that result in the unlawful copying of a copyrighted work, the mere ownership, construction, or supervision of the machine or system will not establish volitional conduct. In Cartoon Network, holders of "copyrights to numerous movies and television programs," sued Cablevision alleging that Cablevision's proposed operation of "its new 'Remote Storage DVR System' ['RS-DVR'] . . . would directly infringe their exclusive rights to both reproduce and publicly perform their copyrighted works." 536 F.3d at 124. The RS-DVR system would have allowed Cablevision customers to record any particular program "on central hard drives housed and maintained by Cablevision at a 'remote' location." Id. Customers could "then receive playback of those programs through their home television sets." Id. In finding that any copying of copyrighted material by operation of the RS-DVR system was not the result of "volitional conduct" by Cablevision, the Second Circuit stated:

> In determining who actually "makes" a copy, a significant difference exists
> between making a request to a human employee, who then volitionally operates
> the copying system to make the copy, and issuing a command directly to a system,
> which automatically obeys commands and engages in no volitional conduct. In
> cases like Princeton Univ[.] Press[ v. Mich. Document Servs., Inc., 99 F.3d 1381,
> 1383 (6th Cir. 1996)], the defendants operated a copying device and sold the
> product they made using that device. See [id.] at 1383 ("The corporate defendant
> . . . is a commercial copyshop that reproduced substantial segments of
> copyrighted works of scholarship, bound the copies into 'coursepacks,' and sold
> the coursepacks to students. . . ."). Here, by selling access to a system that

> automatically produces copies on command, Cablevision more closely resembles
> a store proprietor who charges customers to use a photocopier on his premises,
> and it seems incorrect to say, without more, that such a proprietor "makes" any
> copies when his machines are actually operated by his customers.

Id. at 131-32 (ellipses in original).  Cartoon Network further noted that it was of no consequence

that Cablevision had "some control over the content available for recording."  Id. at 125.  As

Cartoon Network put it:

> This conduct is indeed more proximate to the creation of illegal copying than, say,
> operating an ISP or opening a copy shop, where all copied content was supplied
> by the customers themselves or other third parties.  Nonetheless, we do not think
> it sufficiently proximate to the copying to displace the customer as the person
> who "makes" the copies when determining liability under the Copyright Act.

Id. at 132.  Cartoon Network ultimately was "not inclined to say that Cablevision, rather than the

user, 'does' the copying produced by the RS-DVR system."  Id.  The court concluded that "the

person who actually presses the button to make the recording[] supplies the necessary element of

volition, not the person who manufactures, maintains, or, if distinct from the operator, owns the

machine."  Id. at 131.

On the other hand, the Second Circuit has found that the operator of an automated system

that copies copyrighted material without a request from the user may be held to have engaged in

volitional conduct and thus to have violated the Copyright Act.  In EMI Christian Music Grp.,

Inc. v. MP3tunes, LLC, 844 F.3d 79 (2d Cir. 2016), the Second Circuit addressed a website that

permitted users to store music on its server.  At issue in the case was a feature of the website that

would "automatically go check for cover art provided on Amazon.com and download the cover

art to MP3tunes's servers" when a user stored the music.  Id. at 87 (internal quotation marks and

punctuation omitted).  The Second Circuit found that there was "volitional conduct" because the

> system was designed to retrieve one aspect of a copyrighted work (the album art)
> whenever a user uploaded another aspect of a copyrighted work (the song).  In
> other words, the system retrieved a copyrighted item that a user did not request,

frequently without the user's knowledge of the copyrighted nature of the item. This constituted enough evidence, in our view, that copying of the cover art was directed by [the operator of the system], not users.

Id. at 96.

As one district court has recently summarized,

[i]n the context of online platforms that host content uploaded or transmitted by third-party users, a platform cannot be liable for direct copyright infringement based on the allegedly infringing activities of its users unless the platform had some "deliberate role" in the alleged infringement, such that the platform morphed from a "passive provider of a space in which infringing activities happened to occur to an active participant in the process of copyright infringement."

Bus. Casual Holdings, LLC, 2022 WL 837596, at *3 (citations omitted).

III.   DISCUSSION

The amended complaint here alleges that after a user of DistroKid "uploads a copy of his song or album to" the DistroKid website, the user "chooses which Digital Stores it wants DistroKid to populate with his music." Am. Compl. ¶ 73(b).  Depending upon the requirements of the Digital Store, DistroKid "will modify the copy to conform with each Digital Store's uploading requirements."  Id. ¶ 73(c).  DistroKid will then "upload the modified copy to the selected Digital Stores."  Id. ¶ 73(d).

The amended complaint describes DistroKid's role as an online platform used by customers to distribute their music to the Digital Stores.  Thus, White refers to DistroKid as a "distribution platform," references that DistroKid had "control over the [copyright infringement] through its platform . . . via contract and the underlying technology," and acknowledges that users interact with DistroKid by "upload[ing] . . . to" it. Am. Compl. ¶¶ 71, 104, 66.  At no point does the amended complaint show the involvement of "a human employee, who then volitionally operates the copying system to make the copy."  Cartoon Network, 536 F.3d at 131.  Instead, the

11

amended complaint refers broadly to DistroKid, the "company," Am. Compl. ¶ 6, as performing the alleged actions.  See, e.g., id. ¶ 76 ("DistroKid made and stored . . .").

Furthermore, the Distribution Agreement shows that DistroKid makes available a system that is operated by customers to undertake the actions being challenged here.  See Distribution Agreement ¶ 3(a) (referencing the "online user dashboard for [the user's] account on [DistroKid's] website, currently www.distrokid.com (our 'Site')"); id. ¶ 1(a) (referring to DistroKid as a "Service [which] enables [customers] to upload to our servers . . . for distribution to your choice of digital stores"); id. ¶ 2(a) (stating that customers "send [their] Recording(s) to the same Digital Stores via DistroKid"); id. ¶ 1(e) ("We will automatically generate unique identifying codes for each Recording and provide them to your chosen Digital Stores.").

Given that the amended complaint acknowledges that DistroKid is a "platform" used by third-party users — equivalent to "a system," the term used in Cartoon Network, 536 F.3d at 131 — to survive the motion to dismiss, the amended complaint must allege actions on the part of the platform that amount to "some 'deliberate role' in the alleged infringement, such that the platform morphed from a 'passive provider of a space in which infringing activities happened to occur to an active participant in the process of copyright infringement.'"  Bus. Casual Holdings, LLC, 2022 WL 837596, at *3.

White asserts that DistroKid engages in three infringing acts: (1) "ma[king] additional copies beyond the one that Ms. Rivers uploaded," (2) "prepar[ing] an unauthorized derivative copy by changing the format of the work," and (3) "distribut[ing] unauthorized copies of infringing material to other websites—websites of its choosing."  Opp. at 6; see id. at 11. Stripped of conclusory language accusing DistroKid of acting without "authorization," the referenced paragraphs in the amended complaint allege that DistroKid "made additional . . .

copies from the copy posted by Ms. Rivers," "changed the format of at least one copy," and "then distributed the Album to various Digital Stores . . . chosen by DistroKid for the express purpose of publicly and commercially distribut[ing] and performing copyrighted music." Id. ¶¶ 77-79.

But volitional conduct is not shown merely by alleging that a system copied, reformatted, or distributed copyrighted material, even if the system's functions can be broken down into three separate events. White must still identify "the volitional conduct that causes the copy to be made" in order to determine "the author of an allegedly infringing instance of reproduction." Cartoon Network, 536 F.3d at 131. There is nothing in the amended complaint to suggest that these acts were anything other than part of an automated process: that is, to use the language of the Amended Complaint, that DistroKid "populates" a file to the various Digital Stores, Am. Compl. ¶ 69, as a result of a command of its customer. It would be pure speculation to conclude from the allegations that there was human involvement in the three steps identified by White. Rather, the only reasonable inference to be drawn from the complaint is that the volitional conduct was engaged in by Rivers, who "issu[ed] a command directly to a system, which automatically obeys commands and engages in no volitional conduct," Cartoon Network, 536 F.3d at 131. Automated actions, by themselves, do not amount to a "deliberate role" and do not change the DistroKid website from a "passive provider of a space in which infringing activities happened to occur to an active participant in the process of copyright infringement." Bus. Casual Holdings, LLC, 2022 WL 837596, at *3 (citations omitted). This conclusion is in line with case law holding that the making of "additional copies that remained on" a defendant's server does not by itself show volitional conduct. See Waidhofer v. Cloudflare, Inc., 2021 WL 8532943, at *4 (C.D. Cal. Sept. 29, 2021) (alteration omitted).

White makes a number of arguments to avoid this result.  First, White argues that the mere making of an additional copy that was not specifically requested by the user necessarily constitutes "volitional" conduct, citing BWP Media USA Inc. v. Polyvore, Inc., 922 F.3d 42, 44 (2d Cir. 2019) (per curiam).  See Opp. at 6.  But BWP Media USA Inc. did not hold that any unrequested copying that occurs as part of an automated process automatically amounts to volitional conduct.  While the brief per curiam opinion concluded that the district court's grant of summary judgment was error "because there [was] a dispute of material fact regarding whether [the defendant] created multiple copies of [the plaintiff's copyrighted] photos that were not requested by [defendant's] users," 922 F.3d at 44, it did not hold that an automated system's unrequested copying necessarily amounted to volitional conduct.  The images that were copied without the user's request in BWP Media USA Inc. were actually displayed on the platform's website, see id. at 45-46 (Walker, J., concurring), and thus arguably showed "actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." Cartoon Network, 536 F.3d at 130 (citation omitted).  Indeed, at least two concurring judges made clear that the volitional conduct analysis should assess the significance of the copying taken by the automated system.  See BWP Media USA Inc., 922 F.3d at 69 (Pooler, J., concurring in the result) (question of whether the defendant has engaged in sufficient volitional conduct "will boil down to whether [the defendant website] is sufficiently tied to the act of copying"); id. at 66 (Newman, J., concurring in the result) (noting that the Fourth Circuit "observed that the Copyright Act creates liability for 'a person who causes in some meaningful way an infringement'") (emphasis in original) (quoting CoStar Grp., Inc. v. LoopNet, Inc., 373 F.3d 544, 549 (4th Cir. 2004)).

White also argues that "DistroKid prepared an unauthorized derivative copy by changing the format of the work."  Opp. at 6.  Certainly, the Distribution Agreement makes clear that DistroKid may engage in a reformatting process.  Distribution Agreement ¶ 1(c) ("DistroKid reserves the right to convert audio files of the Recordings as necessary.")  However, the reformatting of a song file does not necessarily indicate human involvement or other volitional conduct.  Indeed, in Cartoon Network, "reformat[ting]" was part of the process that was not found to be a volitional act of copyright infringement.  See 536 F.3d at 124; id. at 131 ("There are only two instances of volitional conduct in this case: Cablevision's conduct in designing, housing, and maintaining a system that exists only to produce a copy, and a customer's conduct in ordering that system to produce a copy of a specific program.")

White argues that the "distribut[ion of] unauthorized copies . . . to other websites," which, White emphasizes, were selected by DistroKid, constitutes volitional conduct.  Opp. at 6 (emphasis in original).  Thus, White asserts, it was DistroKid that "presse[d] the button."  Id. (citation omitted).  However, the complaint does not allege that DistroKid chose which sites to send White's Original Beats to.  It alleges instead that the person who "uploads a copy of his song or album to DistroKid's website . . . chooses which Digital Stores it wants DistroKid to populate with his music."  Am. Comp. ¶ 73(b).  This is the only distribution alleged in the complaint and there is nothing to suggest that it required any human involvement other than Rivers'.  Obviously, DistroKid had to initially "choose" the Digital Stores that were potential recipients of its customers' music as well as determine the formatting requirement for each of the Digital Stores.  But this initial choice is no different from the choice made by Cablevision as to which channels were going to be made available for the RS-DVR service — an act that was not

deemed to be conduct which "supplie[d] the necessary element of volition" in <u>Cartoon Network</u>. 536 F.3d at 131.

White also points to various clauses of the Distribution Agreement which, he asserts, show that DistroKid is "doing the distributing." Opp. at 7; <u>see id.</u> at 7-8. Certainly, these clauses show that DistroKid views itself as the overseer of the system that distributes the songs to the various platforms. But these clauses do not address the issue of whether a human other than Rivers caused the distribution to happen.

In sum, the amended complaint alleges that DistroKid is a platform that allows a copyright holder to transmit songs to websites such as YouTube and Spotify by having the copyright holder upload the songs onto the DistroKid platform and choose the websites that are to be populated by those songs. To be sure, DistroKid operates the system that takes the necessary steps to transmit the songs in the proper format to the platforms chosen by the user. But it would be entirely speculative to say that this process requires human involvement to the extent the process entails copying, reformatting or distribution. Nor can we say that the system reflects that DistroKid played "some 'deliberate role' in the alleged infringement, such that the platform morphed from a 'passive provider of a space in which infringing activities happened to occur to an active participant in the process of copyright infringement.'" <u>Bus. Casual Holdings, LLC</u>, 2022 WL 837596, at *3. Accordingly, we see no material difference between DistroKid's responsibility for infringement and that of the owner of the copy shop who provides the machines that allow infringement to potentially occur. As a result, we conclude that the amended complaint does not show that DistroKid engaged in volitional conduct and thus it cannot be liable for direct copyright infringement.

Conclusion

For the foregoing reasons, DistroKid's motion for judgment on the pleadings (Docket # 98) is granted. Thus, White's direct copyright infringement claims against DistroKid are dismissed. Because the only other claim against DistroKid has been dismissed, DistroKid shall no longer be a defendant in this action. The case will continue as to defendant Eunice Rivers.

SO ORDERED.

Dated: February 11, 2025
    New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge